UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT OWENSBORO
CIVIL ACTION NO. 4:01CV-00195-ERG

SHARON MACY                                                    PLAINTIFF

VS.

HOPKINS COUNTY BOARD OF EDUCATION                             DEFENDANT

## MEMORANDUM OPINION

### BACKGROUND

Before the Court is Defendant's motion for summary judgment (DN 46).  Plaintiff has filed a response in opposition to the motion (DN 50) and Defendant has filed a reply memorandum (DN 51).

In her amended complaint Plaintiff, Sharon Macy ("Macy"), alleges wrongful termination by Defendant, the Hopkins County Board of Education ("Board of Education"), in violation of the Americans with Disabilities Act ("ADA") and KRS 344.040 as well as retaliatory discharge in violation of KRS 344.280 (DN 35).  Having been fully briefed, these matters are now ripe for disposition.

### STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate if "the pleadings depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  The inquiry under Rule 56(c) is

"whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-252 (1986); see also Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment...against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial..." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

The party seeking summary judgment bears the initial burden of informing the Court of the basis of its motion and demonstrating the absence of any genuine issue of material fact. Celotex, 477 U.S. at 322-323. Once the moving party satisfies this burden, the burden shifts to the non-moving party to demonstrate there is a genuine issue of fact for trial. Anderson, 477 U.S. at 247-248. Although the Court must review the evidence in a light most favorable to the non-moving party, the non-moving party is required to do more than simply show that there is some "metaphysical doubt as to the material facts." Matsushita Elec. Ind. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Rule 56 requires the non-moving party to present "*specific facts* showing there is a *genuine* issue for trial," by affidavit, depositions, answers to interrogatories, and/or admissions on file. Fed.R.Civ.P. 56(c) and (e) (emphasis added); Celotex, 477 U.S. at 324. The substantive law governing the case will determine what issues of fact are material. Street, 886 F.2d at 1479-1480. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, the motion for summary judgment should be granted." Pitts v. Michael Miller Car Rental, 942 F.2d 1067, 1069-1070 (6th Cir. 1991) (citing Matsushita Elec. Ind. Co., 475 U.S. at 586).

STATEMENT OF THE FACTS

Plaintiff, Sharon Macy ("Macy"), was employed as a physical education teacher by Defendant, Hopkins County Board of Education ("Board of Education"), from August of 1981 through November 30, 2000.  On June 6, 1987, Macy sustained a severe closed head injury while making a cross-country bike trek with her twin sister.[1]  Remarkably, Macy returned to teaching in August of 1987 (DN 46, Exhibit 1, Deposition of Macy at 18).  An automobile accident in 1995 apparently exacerbated the closed head injuries Macy suffered in 1987 (DN 35, Amended Complaint at Paragraph 6).

In 1996, the Board of Education determined Macy needed certain accommodations in the workplace as a result of her closed head injuries.  Assistant Superintendent, Linda Zellich ("Zellich"), and Kevin Sloan, a teacher's advocate for the Kentucky Education Association ("KEA"), were involved in the creation of the "504 Individualized Accommodation Plan" ("504 Plan")[2] that set forth workplace accommodations for Macy (DN 46, Exhibit 3, Zellich Deposition at 59-68; DN 50, Exhibit 1).  Ms. Zellich was also involved in subsequent modifications to the 504 Plan and overseeing the 504 Plan (DN 46, Exhibit 3, Zellich Deposition at 59-68, 84).  Ms. Zellich understood the 504 Plan was being implemented due to Macy having difficulty maintaining

---

[1] Macy's bike fell into the roadway where a passing car clipped or ran over the back part of her head (DN 46, Exhibit 1, Deposition of Macy at 18).

[2] In essence, § 504 of the Rehabilitation Act of 1973 prohibits discrimination on the basis of disability in "any program or activity receiving Federal financial assistance..." 29 U.S.C. § 794(a).  Most commonly, parents and the local education agency work together to formulate a § 504 Individualized Accommodation Plan for each handicapped child's education.  See e.g. Howell By Howell v. Waterford Public Schools, 731 F.Supp. 1314 (E.D. Mich. 1990).  Here, one of the school psychologists and/or a special ed teacher suggested a § 504 Individualized Accommodation Plan be developed to address Macy's needs due to her closed head injuries (DN 46, Exhibit 1, Macy Deposition at 18-20; DN 46, Exhibit 3, Zellich deposition at 58-60).

attention, headaches, short-term memory deficits, disruptive sleep, depression, difficulty controlling irritability, outbursts with others, and anger (DN 46, Exhibit 3, Zellich Deposition at 80-81).

The 504 Plan acknowledges that Macy's disabling condition is a "post concussive syndrome" caused by a closed head injury (DN 50, Exhibit 1). It describes her symptoms as "[r]ecurrent headaches, difficulty with attention and concentration, short term memory deficits, disrupted sleep, depression and/or anxiety, irritability with others and outbursts of anger"(DN 50, Exhibit 1). If Plaintiff experienced a headache, the 504 Plan accommodated her by having a staff member take over her class while she went to an available designated area with a cot where she could recline and relax (DN 46, Exhibit 1, Macy Deposition at 20; DN 50, Exhibit 1 at Page 3). Another accommodation under the 504 Plan involved directing students going to the vocal music and band room to use the outside exit so that they do not pass through the gymnasium during Macy's physical education classes (DN 50, Exhibit 1 at 3). This accommodation was intended to "eliminate confusion, disruptions, and minimize the opportunity for horseplay" (DN 50, Exhibit 1 at 3). During her deposition, Macy indicated another accommodation under the 504 Plan involved her covering detention in the afternoons so she could avoid high noise level areas (DN 46, Exhibit 1, Macy Deposition at 20). Notably, during her deposition, Macy conceded that the 504 Plan did not allow her to engage in any criminal activity or conduct that violated Kentucky laws for teachers (DN 46, Exhibit 1 at 20).

Daryl Herring ("Herring") was the Principal of the school where Macy taught physical education. Mr. Herring understood the 504 Plan was being implemented because Macy experienced severe headaches, outbursts of anger, irritability, difficulty with concentration and memory loss (DN 46, Exhibit 4, Herring Deposition at 14-15).

There is no dispute that Macy repeatedly complained about Mr. Herring not following

4

or carrying out provisions of her 504 Plan (DN 46, Exhibit 1, Macy Deposition at 21-22; Exhibit 3, Zellich Deposition at 82-83).  Macy made her complaints to Zellich and KEA representatives (DN 46, Exhibit 3, Zellich Deposition at 85).

On February 21, 2000, Macy filed a complaint with the Equal Employment Opportunity Commission and the Kentucky Commission on Human Rights ("The EEOC Complaint") (DN 46, Exhibit 1, Macy Deposition at 57-58).  In her complaint Macy alleged the Board of Education had not made all of the agreed to necessary accommodations that address her disability (DN 46, Exhibit 1, Macy Deposition Exhibit No. 4).  Additionally, Macy accused Herring, the school Principal, of singling her out for being tardy on September 1, 1999 and, after she complained to the Assistant Superintendent,  retaliating against her on November 23, 1999, by sending out a letter of reprimand regarding an incident that allegedly occurred on November 5, 1999 (DN 46, Exhibit 1, Macy Deposition Exhibit No. 4).  Macy alleged discrimination in violation of the ADA, KRS 344.040, and KRS 344.280 (DN 46, Exhibit 1, Macy Deposition Exhibit No. 4).

In the late afternoon of November 1, 2000, an incident occurred at school that involved Macy and nine members of the middle school basketball team.  As Macy left the school building to head home, she encountered some unsupervised boy basketball players outside of the building (DN 46, Exhibit 1, Macy Deposition at 28).  She directed the boys to go back inside to the gym where they would be supervised (DN 46, Exhibit 1, Macy Deposition at 28).  Macy recalls giving the boys a lecture about playing outside unsupervised (DN 46, Exhibit 1, Macy Deposition at 28-29).  During this lecture Macy claims she told the boys that they could have been seriously hurt or killed because they were flipping around on the poles (DN 46, Exhibit 1, Macy Deposition at 29).  The boys recall Macy threatened to "kill" them if she heard them making fun of the girls and that she repeated this threat, saying that she "meant it" (DN 46, Exhibit No. 8 at Page 8).

5

Following the above incident, the Superintendent, James Lee Stevens ("Superintendent Stevens"), conducted an investigation with the help of Assistant Superintendents Lany Woodward and Zellich, as well the Board of Education attorney, J. Keith Cartwright (DN 46, Exhibit 2, Stevens Deposition at 80-82, 99-100, 102-103).  After completing the investigation, Superintendent Stevens notified Macy by letter, dated November 30, 2000, that her contract of employment was being terminated effective that date on the grounds that she engaged in conduct unbecoming a teacher (DN 46, Exhibit 2, Macy Deposition Exhibit No. 1).  In relevant part, the letter reads as follows:

> "Specifically, our investigation reveals that on November 1, 2000 you have threatened to kill students, you have made inappropriate remarks about the marital status of children's family members, you have made inappropriate sexual remarks, and you have had a pattern and history of conduct which is inappropriate and unbecoming.
>
> This is the most recent incident in which you made inappropriate remarks to students.  It is the latest in a series of incidents which is the basis for our decision to terminate your contract and employment with the Hopkins County Board of Education.  In addition to the above allegations, our investigation and your records indicate additional actions which are unbecoming to a teacher including but not limited to the following..."

(DN 46, Exhibit 1, Macy Deposition Exhibit No. 1 at Page 1).  The letter then identifies thirty-one additional incidents of behavior deemed unbecoming a teacher under KRS 161.790(1)(b) (DN 46, Exhibit 1, Macy Deposition Exhibit No. 1 at Pages 1-4).

Meanwhile, on November 29, 2000, Macy was formally charged in the Hopkins District Court with nine counts of terroristic threatening in the third degree, a class A misdemeanor, because of her threats to "kill" the nine boys.  While Macy denies threatening to kill the boys, she concedes all nine of the students so testified during a criminal trial before the Hopkins District Court (DN 46, Exhibit 1, Macy Deposition at 29-32).  Macy also acknowledges the jury found her guilty

6

of nine counts of terroristic threatening and her conviction was affirmed when she appealed to the Hopkins Circuit Court, the Kentucky Court of Appeals and the Supreme Court of Kentucky (DN 46, Exhibit 1, Macy Deposition at 32-33).  She acknowledges the Supreme Court of the United States declined to hear her case (DN 46, Exhibit 1, Macy Deposition at 33).

Meanwhile, Macy pursued an administrative appeal of the decision to terminate her teaching contract (DN 46, Exhibit 1, Macy Deposition Exhibit No. 2).  Following an evidentiary hearing, a three-member tribunal found Macy guilty of conduct unbecoming a teacher and imposed the punishment of termination of her teaching contract (DN 46, Exhibit 1, Macy Deposition Exhibit No. 2).  In regard to the November 1, 2000 incident, the tribunal found "Macy's threats to kill students, her inappropriate statements about the marital status of children's families, and her inappropriate remarks regarding the students' sexual activity constituted conduct unbecoming a teacher in violation of KRS 161.790" (DN 46, Exhibit 1, Macy Deposition Exhibit No. 2 at page 5). The tribunal concluded the "seriousness of the misconduct of threatening to kill students in itself warrants termination, and the other instances of conduct unbecoming a teacher show a pattern of misconduct and serve to reinforce that sanction"[3] (DN 46, Exhibit 1, Macy Deposition Exhibit No. 2 at page 6).  The tribunal rendered its decision on January 25, 2001 (DN 46, Exhibit 1, Macy Deposition Exhibit No. 2 at page 7).

Meanwhile, the Kentucky Commission on Human Rights dismissed Macy's EEOC complaint in an order dated June 21, 2001 (DN 46, Exhibit 1, Macy Deposition Exhibit No. 5).  The

---

[3]The tribunal found the other instances of conduct unbecoming a teacher, in violation of KRS 161.790, are (1) making derogatory comments about a parent, site base council member and a faculty member in front of a classroom of students; (2) sending a fake detention slip to the assistant principal; and (3) improperly disciplining students and transferring them out of her class to other teachers during class time on September 28, 2000 (DN 46, Exhibit 1, Macy Deposition Exhibit No. 2 at pages 4-5).

dismissal order indicates a finding of no probable cause to believe the Board of Education has engaged in an unlawful practice in violation of the Kentucky Civil Rights Act (DN 46, Exhibit 1, Macy Deposition Exhibit No. 5).

On August 16, 2001, the EEOC issued a document entitled "DISMISSAL AND NOTICE OF RIGHTS" (DN 46, Exhibit 1, Macy Deposition Exhibit No. 6). In this document the EEOC notified Macy that it had adopted the findings of the Kentucky Commission on Human Rights that investigated her complaint regarding the Board of Education (DN 46, Exhibit 1, Macy Deposition Exhibit No. 6). The document also provided Macy with notice of her suit rights (DN 46, Exhibit 1, Macy Deposition Exhibit No. 6)

Meanwhile, Macy timely appealed to the Hopkins Circuit Court the administrative decision terminating her teaching contract with the Board of Education (DN 46, Exhibit 1, Macy Deposition Exhibit No. 7). In an order entered December 7, 2001, the Hopkins Circuit Court affirmed the administrative decision terminating Macy's teaching contract (DN 46, Exhibit 1, Macy Deposition Exhibit No. 7). Notably, one of the issues addressed by the Hopkins Circuit Court is whether the tribunal committed reversible error by not allowing specific instructions related to the ADA (DN 46, Exhibit 1, Macy Deposition Exhibit No. 7 at page 4). The Circuit Court commented as follows:

> "As stated above, the only reason for termination as provided in Petitioner's termination letter was that she engaged in conduct which is unbecoming a teacher. While the court acknowledges that special steps need to be taken in order to assure that those persons with disabilities are not discriminated against, said persons still are required to be able to adequately perform the job in which they are hired to do.
>
> In this case, where Petitioner was hired to be a teacher and role model for her students, she was required to be capable of conducting herself in a manner which is becoming of a teacher, especially in front of or towards students. If Petitioner is incapable of conducting herself in such manner due to her disability, despite reasonable accommodations under her 504 Plan, as shown by her pattern of behavior,

> then Respondent is permitted to terminate her contract on said grounds.  There is no case law or other authority which allows Petitioner to use her disability as an excuse to allow behavior that would not be tolerated if done by other 'non-disabled' teachers.  Thus, this court finds that the tribunal committed no reversible error in refusing to allow instructions based upon her disability under the ADA."

(DN 46, Exhibit 1, Macy Deposition Exhibit No. 7 at pages 4-5).  Macy timely appealed the Hopkins Circuit Court order.

On December 13, 2002, the Kentucky Court of Appeals rendered an opinion affirming that order (DN 46, Exhibit 1, Macy Deposition Exhibit No. 8).  One of the issues addressed by the Kentucky Court of Appeals is whether the Hopkins Circuit Court erred in finding the tribunal properly refused to allow specific instructions related to the ADA (DN 46, Exhibit 1, Macy Deposition Exhibit No. 8 at page 5-6).  It concluded since Macy asked the tribunal to find her conduct did not rise to the level of conduct unbecoming a teacher because of her disability, the only applicable law was KRS 161.790, and as such there was no error (DN 46, Exhibit 1, Macy Deposition Exhibit No. 8 at page 6).  The Kentucky Court of Appeals also noted during the administrative hearing, Macy indicated she was not asking for a determination of whether her termination was the result of discrimination under the ADA (DN 46, Exhibit 1, Macy Deposition Exhibit No. 8 at page 6).  The Supreme Court of Kentucky denied her motion for discretionary review in an order entered August 17, 2005 (DN 46, Exhibit 1, Macy Deposition Exhibit No. 9).

Meanwhile, on December 14, 2004, the Kentucky Department of Education, through the Kentucky Education Professional Standards Board, revoked Macy's teaching certificate for a period of ten (10) years (DN 46, Exhibit 1, Macy Deposition Exhibit No. 10).

Macy's amended complaint alleges that, as a result of her 504 Plan, the Board of Education was on notice of her disability and the difficulties it caused with maintaining concentration, anxiety, irritability, severe headaches, outbursts of anger, loud noises, memory, and

9

depression (DN 35).  The amended complaint asserts, despite the Board of Education's use of "corrective action plans" and  "growth plans" to address employment related problems with other employees, it made no such effort in her case (DN 35).  Macy alleges as a result of her repeated complaints about Mr. Herring not following the 504 Plan, he engaged in a course of retaliatory conduct that created a hostile work environment and included intentional discrimination against her (DN 35).  The amended complaint alleges after Macy filed her EEOC complaint, Mr. Herring and the Board of Education retaliated by terminating her employment for threatening a group of students (DN 35).  Macy points out the decision to terminate occurred before any judicial determination that she had threatened the students (DN 35).  She alleges that her treatment was far more severe than the five-day suspension Patricia Bush, another teacher, received following a May 2003 threat to kill a student (DN 35).  Macy asserts her treatment was far different from the manner in which the Board of Education treated another teacher, Rachel Reece, after being charged in Christian County with felony drug trafficking and possession charges (DN 35).  Macy claims the Board of Education agreed to allow Ms. Reece to continue her employment and teaching duties after she pled guilty to misdemeanor drug and/or criminal charges (DN 35).  The amended complaint alleges Macy was treated differently than similarly situated employees because of her disability, her filing the EEOC complaint, and her complaints to the Board of Education about her 504 Plan (DN 35).

The amended complaint alleges the Board of Education has violated the ADA; has retaliated against her for repeated complaints to the Board of Education about her 504 Plan; has retaliated against her for the complaints she filed with the EEOC; has violated KRS 344.040; and has violated KRS 344.280 (DN 35).  In her prayer for relief, Macy seeks compensatory damages (including lost wages); damages for emotional distress and humiliation; punitive damages; a judgment directing the Board of Education to re-employ her and establishing a 504 Plan that will

10

accommodate her disability; attorney's fees and costs; and all other relief the Court deems

appropriate (DN 35).


<u>DISCUSSION</u>

A

The ADA proscribes discrimination "against a qualified individual with a disability

because of the disability of such individual in regard to job application procedures, the hiring,

advancement, or discharge of employees, employee compensation, job training, and other terms,

conditions, and privileges of employment." 42 U.S.C. § 12112(a). To establish a prima facie case

of discrimination under the ADA, Macy must show she is (1) a disabled person within the meaning

of the Act [4]; (2) who is otherwise qualified to perform the essential functions of her job with or

---

[4]The Act defines a disabled person as one who (1) has a physical or mental impairment
that substantially limits one or more of the major life activities of such individual, (2) has a
record of such impairment, or (3) does not have an impairment, but is regarded as having one.
<u>Sullivan v. River Valley School Dist.</u>, 197 F.3d 804, 810 (6th Cir. 1999) (citing 42 U.S.C. §
12102(2)). The regulations define the phrase "substantially limits" as follows:
> "(I) Unable to perform a major life activity that the average person in the general
> population can perform; or
> (ii) Significantly restricted as to the condition, manner or duration under which an
> individual can perform a particular major life activity as compared to the
> condition, manner, or duration under which the average person in the general
> population can perform that same major life activity."

29 C.F.R. § 1630.2(j)(1) (1996). The phrase "major life activities" is defined as "functions such
as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing,
learning, and working." 29 C.F.R. § 1630.2(I). Interpretive guidelines explain the above list "is
not exhaustive" and that "other major life activities include, but are not limited to, sitting,
standing, lifting, [and] reaching." 29 C.F.R. Pt. 1630 App.; <u>Penny v. United Parcel Serv.</u>, 128
F.3d 408, 414 (6th Cir. 1997). In deciding whether an individual is substantially limited in a
major life activity, the Court should consider the following factors:
> (I) The nature and severity of the impairment;
> (ii) The duration or expected duration of the impairment; and
> (iii) The permanent or long term impact, or expected permanent or long term
> impact of or resulting from the impairment."

without reasonable accommodation; and (3) that she was discharged solely by reason of her handicap.  Sullivan v. River Valley School Dist., 197 F.3d 804, 810 (6th Cir. 1999); Monette v. Electronic Data Systems Corp., 90 F.3d 1173, 1178 (6th Cir. 1996).

The Board of Education has not asked the Court for entry of summary judgment on all three requirements in the foregoing framework (DN 46).  Instead, it seeks entry of summary judgment on the limited question of whether Macy was discharged solely by reason of her disability (DN 46).  Thus, the Board of Education concedes, at least for the purpose of its summary judgment motion, that Macy is a disabled person within the meaning of the ADA who is otherwise qualified to perform the essential functions of her teaching job with or without reasonable accommodation.

The specific method of proof that applies under the foregoing framework will vary depending on whether Macy presents direct evidence of discrimination, or establishes a *prima facie* case which creates an inference of discrimination based on circumstantial evidence.  Monette, 90 F.3d at 1182-1185; Burns v. City of Columbus, 91 F.3d 836, 841-843 (6th Cir. 1996).  In direct evidence cases:

> "(1) The plaintiff bears the burden of establishing that he or she is disabled. (2) The plaintiff bears the burden of establishing that he or she is 'otherwise qualified' for the position despite his or her disability: (a) without accommodation from the employer; (b) with an alleged 'essential' job requirement eliminated; or (c) with a proposed reasonable accommodation. (3) The employer will bear the burden of proving that a challenged job criterion is essential, and therefore a business necessity, or that a proposed accommodation will impose an undue hardship upon the employer."

Hedrick v. Western Reserve Care System, 355 F.3d 444, 452 (6th Cir. 2004) (citing Monette, 90 F.3d at 1186.

The Sixth Circuit has indicated in an ADA case, direct evidence is evidence that

29 C.F.R. § 1630.2(j)(2).

demonstrates the plaintiff's disability is the ***sole reason***[5] for an adverse employment action. Hedrick, 355 F.3d at 455.  Evidence of discrimination is not considered direct evidence unless a discriminatory motivation is explicitly expressed.  For example, a facially discriminatory employment policy or a corporate decision maker's express statement of a desire to avoid hiring or firing handicapped employees is direct evidence of discriminatory intent.  It can also be an oral or written comment indicating discriminatory animus by a supervisor.  Id. at 454-455; Ross v. Campbell Soup Co., 237 F.3d 701, 706-708 (6th Cir. 2001).  For example, a supervisor's note that identifies the employee as a "back case" and a "problem person" as well as asks for advice on how to discharge the employee indicates discriminatory animus.  Ross, 237 F.3d at 706-708.  However, a supervisor's comment must be viewed in the entire context of the case to determine whether it is but one event in a series of comments which, when taken cumulatively, is sufficient to create a genuine issue of material fact precluding summary judgment.  Hedrick, 355 F.3d at 454.  For example, an isolated comment by a job interviewer to a treating physician that is clearly an expression of concern for the plaintiff's ability to perform a specific job's requirements, which included a fair amount of walking, is not sufficient direct evidence of discriminatory animus to survive a summary judgment motion.  Hedrick, 355 F.3d at 455.  In sum, "[d]irect evidence is evidence that proves the existence of a fact without requiring any inferences."  Minadeo v. ICI

---

[5]Relying on the analysis in DiCarlo v. Potter, 358 F.3d 408, 415 (6th Cir. 2004), Macy argues direct evidence need only demonstrate that unlawful discrimination was at least a motivating factor in the employer's actions (DN 50 at 16).  While the Sixth Circuit has applied this standard to national origin discrimination claims, Id., it has expressly declined to do so as to ADA claims.  Hedrick v. Western Reserve Care System, 355 F.3d 444, 455 (6th Cir. 2004).  Further, the Sixth Circuit has declined a plaintiff's request to permit recovery under the ADA in mixed motive cases.  Hedrick, 355 F.3d at 454 (citing McLeod v. Parsons Corp., 73 Fed.Appx. 846 (6th Cir. 2003)).  In sum, Macy must show that her disability was the ***sole reason*** for the Board of Education's decision to terminate her teaching contract in order to withstand a summary judgment motion.  Hedrick, 355 F.3d at 454.

Paints, 398 F.3d 751, 763 (6th Cir. 2005).

      Macy argues there is direct evidence showing her disability is the reason for termination of her teaching contract (DN 50 at 16-18).  Her argument is premised on the belief that the incident on November 1, 2000 is merely an outburst of anger and irritability which are symptoms of her disabling condition that the 504 Plan is intended to accommodate[6] (DN 50 at 17-18).  Macy reasons since the 504 Plan is intended to accommodate such outbursts and Superintendent Stevens cited the November 1, 2000 outburst as a factor in terminating her contract, this is direct evidence of discrimination (DN 50 at 17-18).  Macy argues since the 504 Plan is intended to accommodate the other behavioral problems identified by Superintendent Stevens, this is direct evidence of discrimination[7] (DN 50 at 17-18).

      Clearly, the above cited evidence requires the Court to draw an inference in order to prove the existence of a fact.  Thus, this is not direct evidence showing that Macy was fired because of post concussive syndrome.

      The evidence, viewed in a light most favorable to Macy, demonstrates she was fired primarily because she told nine male students on the basketball team that she would "kill" them if she heard them making fun of the girls and then she repeated the threat, saying she "meant it" (DN 1, Exhibit 1, Macy Deposition Exhibit No. 8 at page 8).  The cause of the threat was, we may assume, her post concussive syndrome which produces symptoms such as irritability with others and

---

    [6]In support of her position, Macy asserts Principal Herring testified he was not concerned about her "remark" and viewed it as "just Macy and the 504 Plan issues" (DN 50 at 17).

    [7]In support of this argument, Macy asserts Assistant Superintendent Zellich testified that Macy was never placed on a Corrective Action Plan to address the behaviors and issues outlined in the Superintendent's termination letter because they were all being accommodated as stemming from her disability (DN 50 at 17).

outbursts of anger (DN 50, Exhibit 1).  However, if an employer fires an employee because of the employee's unacceptable behavior or misconduct, the fact that the behavior or misconduct was precipitated by a disabling condition does not present an issue under the ADA or Section 504 of the Rehabilitation Act.  See Palmer v. Circuit Court of Cook County, Ill., 117 F.3d 351, 352 (7th Cir. 1997), cert. denied 522 U.S. 1096 (1998), rehg. denied 523 U.S. 1042 (1998) (mentally ill employee fired because she threatened to kill another employee); Newland v. Dalton, 81 F.3d 904, 906 (9th Cir.1996) (alcoholic employee terminated because he attempted to fire an assault rifle inside a bar, "the kind of egregious and criminal conduct which employees are responsible for regardless of any disability"); Little v. FBI, 1 F.3d 255, 258-259 (4th Cir.1993) (alcoholic fired because of alcohol related misconduct while on duty not because of alcoholism).

The ADA does not require an employer to retain a potentially violent employee. Palmer, 117 F.3d at 352.  "Such a requirement would place the employer on a razor's edge - in jeopardy of violating the Act if it fired such an employee, yet in jeopardy of being deemed negligent if it retained him and he hurt someone."  Id.  The ADA protects only "qualified" employees, that is a teacher qualified to do the job for which she is hired; and threatening to kill students disqualifies Macy from being a teacher.  Id. at 352-353 (citations omitted).  Furthermore, the ADA does not require the Board of Education to make accommodations for her disability when those accommodations pose a direct threat to the students at the school.  42 U.S.C. § 12113(b); 29 C.F.R. 1630.15(b)(2).

Macy's direct evidence argument is also premised on the belief that there are differences between how Superintendent Stevens dealt with her, a disabled employee who filed an EEOC Complaint, and Patricia Bush (DN 50 at 17-18).  Macy characterizes Bush as a non-disabled teacher who committed the "same offense" (DN 50 at 17-18).

15

The Sixth Circuit has held the plaintiff must show that the "comparables" are substantially similar in all respects.  Gray v. Toshiba America Consumer Products, Inc., 263 F.3d 595, 599 (6th Cir. 2001).  To be deemed "similarly situated," the individuals with whom the plaintiff seeks to compare her treatment must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.  Id. (citation omitted).

The unrebutted testimony of Superintendent Stevens shows the offenses of Bush and Macy are factually distinguishable.[8]  Bush's comment was addressed to a teacher's aide and overheard by at least one student in the classroom (DN 46, Exhibit 2, Stevens Deposition at 96, 168).  By contrast, Macy expressed her threat directly to the nine male students.  Additionally, the content differs.  Bush indicated if the teacher's aide did not remove the special education student from the classroom she was going to "kill" him (DN 46, Exhibit 2, Stevens Deposition at 96, 97, 168).  By contrast, Macy told the nine boys "I will kill you" if you continue to make fun of the girls and then she repeated the threat, indicating "she meant it" (DN 46, Exhibit 1, Macy Deposition Exhibit No. 8 at page 8).  Finally, there is no evidence indicating Bush faced several additional charges of conduct unbecoming a teacher.  By contrast, Macy faced 31 additional charges of conduct unbecoming a teacher.  Clearly, this comparable is not substantially similar in respect to the charges.

Macy's direct evidence argument is also premised on the belief that there are differences between how Superintendent Stevens investigated her misconduct and Bush's

---

[8]Rule 56 requires the non-moving party to present "*specific facts* showing there is a *genuine* issue for trial," by affidavit, depositions, answers to interrogatories, and/or admissions on file.  Fed.R.Civ.P. 56(c) and (e) (emphasis added); Celotex v. Corp v. Catrett, 477 U.S. 317, 324 (1986).

misconduct (DN 50 at 17-18).  Macy asserts that Superintendent Stevens requested from Principal

Herring any and all information on Macy but did not make such request as to Bush (DN 50 at 17).

Macy alleges her case is the only one wherein Superintendent Stevens involved the Board of

Education's attorney in an investigation (DN 50 at 17).  Finally, Macy asserts that attorney discussed

her EEOC Complaint with Superintendent Stevens before he made the decision to terminate her

contract (DN 50 at 17-18).

        While there are some differences in how Superintendent Stevens investigated Macy's

misconduct, in contrast to other teachers accused of misconduct, the differences are not direct

evidence of discrimination.  In contrast to the other investigations, Principal Herring asked

Superintendent Stevens to come down to the school to deal with Macy (DN 46, Exhibit 2, Stevens

Deposition at 99-100, 104-105).  Further, he informed Superintendent Stevens of several additional

incidents involving Macy that should have been previously reported to the central office (DN 46,

Exhibit 2, Stevens Deposition at 99-100, 104-105).  In fact, Superintendent Stevens was concerned

about Principal Herring's failure to forward to the central office information about "several alarming

incidents" involving Macy (DN 46, Exhibit 2, Stevens Deposition at 104-105).  Notably, after

Macy's termination, Superintendent Stevens placed Principal Herring on a Growth Plan that

addressed the need for better documentation and notification to the central office (DN 46, Exhibit

2, Stevens Deposition at 105-106).  In sum, Principal Herring's reporting omissions were the reason

Superintendent Stevens made a request for all of the information that Principal Herring had

regarding Macy.

        Bush apparently taught at a different school then Macy.  There is no evidence in the

record indicating additional misconduct by Bush. Nor is there any evidence indicating the school's

principal failed to notify the central office of prior misconduct by Bush.  These differences in

circumstances may explain why Superintendent Stevens did not request all information that the school principal had regarding Bush.

While Superintendent Stevens did not use the Board of Education's attorney to assist in the investigation of misconduct by other teachers, and the Board of Education's attorney did advise Superintendent Stevens of Macy's EEOC Complaint during the investigation (DN 46, Exhibit 2, Stevens Deposition at 98-99, 102, 131), this is no direct evidence showing Macy was fired because of post concussive syndrome.  Again, Plaintiff's evidence does not prove the existence of a fact without requiring any inferences.  Further, there are other reasonable nondiscriminatory inferences that can also be drawn from this evidence.  For example, it can be inferred that Superintendent Stevens viewed Macy's multiple incidents of misconduct as serious, and how well advised he was of Macy's circumstances before he made the decision to terminate her teaching contract.

For the reasons set forth above, the undersigned concludes that Macy has failed to tender any direct evidence that demonstrates her disability was the ***sole reason*** for the decision to terminate her teaching contract.

The undersigned will now address whether Macy has offered sufficient circumstantial proof to survive a motion for summary judgment.  A three step burden-shifting analysis applies when a plaintiff offers circumstantial proof of the defendant's discriminatory intent.  <u>Hedrick</u>, 355 F.3d at 453; <u>Sullivan</u>, 197 F.3d at 810.  This is referred to as the <u>McDonnell Douglas</u> burden-shifting analysis.  <u>Hedrick</u>, 355 F.3d at 453; <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802-03 (1973).  Under the burden-shifting approach, the plaintiff establishes a *prima facie* case of discrimination by showing that (1) she is disabled; (2) otherwise qualified for the position, with or without reasonable accommodation; (3) suffered an adverse employment decision; (4) the employer

18

knew or had reason to know of the plaintiff's disability; and (5) the position remained open while the employer sought other applicants or the disabled individual was replaced. Hedrick, 355 F.3d at 453.

Once a *prima facie* case is established, the burden of production shifts to the employer to offer a legitimate, nondiscriminatory reason for its action. Id. If the employer satisfies this burden of production, the plaintiff must then introduce evidence showing that the proffered reason is a pretext for discrimination. Id.; Walsh v. United Parcel Service, 201 F.3d 718, 724-726 (6th Cir. 2000); Monette, 90 F.3d at 1186-1187 (6th Cir.1996); McDonnell Douglas Corp., 411 U.S. at 802-03; Williams v. City of London, 252 F.Supp.2d 388, 396 (E.D. Ky. 2003). In order for the plaintiff to prevail at the pretext stage, the plaintiff must prove that the reasons stated by the defendant for her termination (1) have no basis in fact; (2) did not actually motivate her discharge; or (3) were insufficient to motivate her discharge. Williams, 252 F.Supp.2d at 396 (citations omitted). Under this scheme, although the burden of production shifts, the burden of persuasion remains at all times with the plaintiff. Hedrick, 355 F.3d at 453; Monette, 90 F.3d at 1186-1187.

Here, the Board of Education seems to concede that a *prima facie* case is established (DN 46). For the reasons set forth above, the Board has offered a legitimate, nondiscriminatory reason for terminating Macy's teaching contract. Thus, the burden shifts to Macy to introduce evidence showing the proffered reason is a pretext for discrimination. Essentially, Macy restates the direct evidence referred to above (DN 50 at 18-19). This evidence is not sufficient to demonstrate there is a genuine issue of fact for trial at the pretext stage. Stated differently, the record taken as a whole could not lead a rational trier of fact to find for Macy. In sum, the Board of Education is entitled to summary judgment in its favor on Macy's claim that it violated the ADA (DN 35 at page 9).

19

B

Macy's second claim in the amended complaint alleges the Board of Education retaliated against her for her complaints that the 504 Plan was not being followed by the Board and Principal Herring; that Principal Herring was intentionally discriminating against her based on her disability; that the 504 Plan was not fulfilling the accommodations that it was intended; and that she was not being fully accommodated by the Board of Education (DN 35 at paragraphs 50-54, 88). Notably, Macy has not identified the law that she believes the Board of Education violated.

The evidence taken as a whole and viewed in a light most favorable to Macy shows the Board of Education terminated Macy's teaching contract because of her misconduct.  No jury could reasonably find otherwise on this evidence.  Thus, the Board of Education is entitled to summary judgment in its favor on this claim, regardless of whether Macy is alleging retaliation in violation of the ADA, or Section 504 of the Rehabilitation Act, or KRS 344.280.

C

Macy's third claim in the amended complaint alleges the Board of Education retaliated against her for her complaints filed with the EEOC (DN 35 at paragraph 90).  Again, Macy has not identified the law that she believes the Board of Education violated.

The evidence taken as a whole and viewed in a light most favorable to Macy shows the Board of Education terminated Macy's teaching contract because of her misconduct.  No jury could reasonably find otherwise on this evidence.  Thus, the Board of Education is entitled to summary judgment in its favor on this claim, regardless of whether Macy is alleging retaliation in violation of the ADA, or Section 504 of the Rehabilitation Act, or KRS 344.280.

D

Macy's fourth claim alleges the Board of Education has violated KRS 344. 040 (DN 35 at paragraph 92).  The relevant part of the statute reads as follows:

> "It is an unlawful practice for an employer:
> (1) To fail or refuse to hire, or **to discharge any individual**, or otherwise to discriminate against an individual with respect to compensation, terms, conditions, or privileges of employment, because of the individual's race, color, religion, national origin, sex, age forty (40) and over, **because the person is a qualified individual with a disability**, or because the individual is a smoker or nonsmoker, as long as the person complies with any workplace policy concerning smoking;"

KRS 344.040(1) (emphasis added).  Since the language in the disability discrimination provisions of the Kentucky Civil Rights Act ("KCRA") tracks the ADA, it should be interpreted consonant with that Act.  Henderson v. Ardco, Inc., 247 F.3d 645, 649 (6th Cir. 2001); Summers v. Middleton & Reutlinger P.S.C., 214 F.Supp.2d 751, 755-756 (W.D. Ky. 2002).  The evidence taken as a whole and viewed in a light most favorable to Macy shows the Board of Education did not terminate Macy's teaching contract because she is a qualified individual with a disability.  Rather, it terminated her teaching contract because of her misconduct.  No jury could reasonably find otherwise on this evidence.

E

Macy's fifth and final claim in the amended complaint alleges the Board of Education has violated KRS 344.280 (DN 35 at paragraph 94).  The relevant part of the statute reads as follows:

> "It shall be an unlawful practice for a person, or for two (2) or more persons to conspire:
> (1) To retaliate or discriminate in any manner against a person because he has opposed a practice declared unlawful by this chapter, or because he has made a

21

charge, filed a complaint, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under this chapter;"

KRS 344.280(1).  To prevail on her retaliation claim, Macy must show that (1) she engaged in a protected activity; (2) the Board of Education knew about the protected activity; (3) the Board of Education took employment action adverse to Macy; and (4) there was a causal connection between the activity engaged in and the adverse treatment.  Underhill v. Caudill, 186 F.Supp.2d 736, 741 (W.D. Ky. 2001) (citing Fenton v. HiSAN, Inc., 174 F.3d 827, 831 (6th Cir.1999)).

Macy has met the first three prongs: she filed the EEOC complaint; the Board of Education knew of the complaint; and the Board of Education subsequently terminated her teaching contract.  However, Macy cannot establish the fourth prong.  The evidence taken as a whole and viewed in a light most favorable to Macy shows the Board of Education terminated Macy's teaching contract because of her misconduct, not because of she filed an EEOC Complaint.  No jury could reasonably find otherwise on this evidence.


F

The Board of Education argues the doctrine of election of remedies as well as the doctrines of res judicata and collateral estoppel bar the issues raised by Macy in this civil action (DN 46 at 9-15).  In light of the above determinations on the merits, the Court need not address these arguments.


CONCLUSION

For the foregoing reasons, the Court concludes that Defendant's motion for summary judgment should be GRANTED.  The Court will issue a separate order granting Defendant's motion

for summary judgment.

Copies:        Counsel